2016 IL App (4th) 130888

NO. 4-13-0888

FILED
March 11, 2016
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Coles County |
| BLACKIE VEACH, | ) | No. 12CF479 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Mitchell K. Shick, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Justice Holder White concurred in the judgment and opinion.
Justice Appleton dissented, with opinion.

**OPINION**

¶ 1        Following a July 2013 trial, a jury convicted defendant, Blackie Veach, of two

counts each of attempt (first degree murder) (720 ILCS 5/8-4(a), 9-1(a) (West 2010)) and

aggravated battery (720 ILCS 5/12-3.05(a)(1), (f)(1) (West 2010)).  The trial court later imposed

consecutive prison sentences of 16 years on defendant's attempt convictions.  (Defendant's

aggravated battery convictions were lesser-included offenses on which the court imposed no

sentences.)

¶ 2        Defendant appeals, arguing only that he was denied the effective assistance of

trial counsel when his counsel stipulated to the admission, during his trial, of video recordings

containing prior consistent statements and bad character evidence.  Because we conclude that we

may be required to consider matters outside the record to adjudicate defendant's claim on direct appeal, we affirm.

¶ 3                                      I. BACKGROUND

¶ 4                                    A. The State's Charges

¶ 5            In December 2012, the State charged defendant with the aforementioned offenses. Pertinent to this appeal are the State's attempt (first degree murder) charges, which were amended in July 2013. Specifically, the State alleged that on December 12, 2012, defendant "performed an act which constituted a substantial step toward the killing of *** individual[s] in that [defendant] cut the throat of" Matthew Price and Renee Strohl.

¶ 6            B. The Pertinent Evidence Presented at Defendant's Trial

¶ 7            Because defendant challenges only his trial counsel's effectiveness, we limit the following discussion to those facts that place defendant's claim in its proper context.

¶ 8            On the third day of defendant's July 2013 trial and outside the jury's presence, the State and defense counsel stipulated to the admission of People's exhibit No. 24, a compact disc (CD) containing a video recording of the December 12, 2012, interview between Johnny Price, who was present during the events at issue, and a police detective. The trial court then addressed defendant directly and determined that (1) he had spoken with his counsel about the stipulation and (2) by stipulating, he waived any foundational objections to the recording. After defendant agreed to the CD's admission, the court confirmed that the content therein was being offered as substantive evidence. After reconvening the jury, the State called Johnny to the stand.

¶ 9                                    1. *Johnny's Testimony*

¶ 10                                  a. Direct Examination

¶ 11        On December 12, 2012, Johnny—who was 18 years old and lived in Toledo, Illinois—rode with his grandmother to Charleston, Illinois, to visit his cousin, Matthew, at the home Matthew shared with his girlfriend, Renee. Throughout that day, visitors came and went, but that evening, only Matthew, Renee, Johnny, and defendant remained in the front room of the house. Matthew was smoking "fake marijuana," otherwise known as K2, Renee was drinking beer, and Johnny was drinking beer and smoking cannabis. Defendant was "drinking and smoking fake marijuana" while talking with Matthew.

¶ 12        Sometime thereafter, Johnny was seated on a sofa, facing a "loveseat," where Matthew and Renee were seated. Defendant was sitting behind Matthew. Johnny momentarily looked away, but when he looked back, he saw defendant—who was now standing behind the loveseat—cut Matthew's neck. Matthew jumped up, holding his neck, and told defendant to "back the fuck up." As Renee picked up her telephone, defendant "cut" her as well. Matthew then pushed defendant down onto a mattress, which was against the wall. During that time, Johnny made his way to the kitchen and exited through the back door of the house. When Johnny looked back, he saw defendant "chasing after [him]."

¶ 13        Johnny ran to the local restaurant and called his grandmother. He was "shaking and crying," and too "scared" to dial 9-1-1. Johnny told the restaurant employees that his cousin's neck had "been sliced." Sometime later, police arrived and transported Johnny to the police station for an interview.

¶ 14                          b. Johnny's Recorded Interview

¶ 15        Thereafter, the State moved to admit into evidence exhibit No. 24, which was the CD containing Johnny's interview with the police. After the trial court confirmed that defense

- 3 -

counsel had no objection, the court admitted exhibit No. 24 into evidence, and at the State's request, it published the recording for the jury's consideration.

¶ 16    During his interview with the police, Johnny recounted the entire incident (to which he had testified during his direct examination), describing the knife attack six times. Johnny also stated that (1) on the evening at issue, defendant claimed to be a member of a street gang; (2) defendant was making gang signs and wanted Johnny to mimic his gestures; (3) defendant compelled Johnny to smoke drugs that night; (4) defendant began having "problems" with Johnny; (5) Matthew warned defendant that if he wanted to confront Johnny, defendant would have to go through Matthew—or "that's what [Johnny was] guessing they said"; (6) after Matthew told defendant he would have to go through him, defendant cut Matthew's throat; and (7) defendant cut Renee and chased Johnny because defendant wanted to kill all the witnesses.

¶ 17    After playing Johnny's recorded interview with police, the trial court instructed the jury that Johnny had been convicted of retail theft, and the jury could consider that conviction only as it might affect his believability.

¶ 18                              c. Cross Examination

¶ 19    Johnny admitted that during his police interview, he "probably" told the police that he did not know if defendant had been smoking anything in Matthew's house. But he was "confused" at the time, and now, in retrospect, Johnny knew defendant had been smoking. Johnny also explained that during his interview, he was "confused," "scared," "high," and "drunk" when he told the detective that he had jumped over the couch in the front room. Actually, he "didn't jump over nothing." Johnny first tried to escape through the front door but could not get it open, and so he headed for the back door.

¶ 20                              2. *Matthew's Testimony*

¶ 21                          a. Direct Examination

¶ 22          Prior to Matthew's direct testimony, the trial court informed the jury that (1) Matthew had been convicted of three felonies and (2) the jury could consider his convictions only as they might affect his believability.

¶ 23          Matthew, who was 22 years old, testified that in December 2012, he lived with his then fiancée, Renee, in a home located in Charleston.  Defendant, Matthew's longtime "best friend," whom he had "always called [his] brother," "stay[ed] with [them] quite often."

¶ 24          On December 12, 2012, around 8:30 or 9 p.m., defendant visited Matthew's home, bringing with him two 40-ounce containers of malt liquor as well as "the baseball bat he always carried," which Matthew described as a small Louisville Slugger, a little longer than Matthew's forearm.  Defendant "[s]tarted talking and playing music."  In addition to drinking alcohol, defendant was smoking K2 with Matthew.  Matthew remembered that he had earlier cut some speaker wires with a kitchen knife that remained in the front room of the home.  Later that evening, Matthew saw defendant pick up the knife as defendant was going to the back door to answer the knock of some visitors.

¶ 25          Eventually, the visitors left except for defendant and Johnny.  Matthew and Renee were sitting on the loveseat, Johnny was sitting on a sofa, and defendant was sitting on a black chair.  Sometime thereafter, Matthew and Renee got up from the loveseat and went into the bathroom, where they had sexual intercourse.  About 20 minutes later, they left the bathroom. As they did so, defendant, who was standing outside the bathroom door, said, " 'What the hell' " and " 'that's bogus.' "  Unable to comprehend what defendant was complaining about, Matthew returned to the loveseat with Renee.  Johnny remained on the sofa.  Defendant sat back down on the black chair and resumed playing with the stereo radio.

¶ 26    After a while, defendant asked Matthew to meet him at the back porch, where no one was located.  After doing so, defendant told Matthew that "he had to put a hit out for Renee [for] beating up his aunt [Debbie Davis,] who isn't actually his aunt."  Matthew told defendant that "it was just a female fight," and although Davis "got her ass whooped," Renee was charged with aggravated battery.  Matthew urged defendant to "let it go."  Eventually, defendant stated, "[a]ll right, all right bro, I got you."  Thereafter, they returned to the front room of the house.

¶ 27    Upon their return, Matthew sat down on the loveseat, beside Renee, and defendant "walked around [as if] he was going to sit in the black chair again," but after a couple of seconds, he "went behind the loveseat to a black foldout chair."  With defendant sitting behind him, Matthew and defendant had a conversation about two street gangs.  Defendant then told Matthew, " 'You're not my brother.  You never have been.' "  Matthew did not get a chance to respond, because, the next thing he knew, there was a "warmness running down [his] neck."

¶ 28    Matthew flung up his hand and "realized [he] was cut," and now his hand "started to get cut," too.  As Matthew "ducked down and spun around *** to the left," he saw defendant "scooting over and cutting Renee."  Defendant had in his hand the kitchen knife that Matthew had earlier used.  Matthew yelled, "['N]o[!]' " and "swung over the couch."  Matthew believed that he had grazed defendant somewhere in the face, causing him to drop the knife and fall backward on a guest bed they had in their front room.  Defendant said "not to call 9-1-1."  As Matthew walked toward defendant, Johnny ran between them, en route to the back door (the front door was nailed shut).  The resulting collision staggered Matthew back, giving defendant an opportunity to "take off after [Johnny] and get out himself."

¶ 29    Renee was on the telephone, but because she was not coherent, Matthew took the telephone from her and told the 9-1-1 operator on the other end to hurry up because their throats

- 6 -

had been slit and they were "bleeding out." The police and an ambulance arrived, and they were transported to the hospital, where Matthew received stitches and was released that night. The next day, December 13, 2012, Matthew went to the Charleston police department and provided a statement, which the police recorded.

¶ 30                                    b. Matthew's Recorded Interview

¶ 31          The State then moved to admit into evidence the first track of People's exhibit No. 28, a CD containing two separate audio recordings, the first of which was Matthew's interview with the police. After the trial court confirmed that defense counsel and defendant had stipulated to the admission of that audio recording, the court admitted that portion of exhibit No. 28 into evidence, and, thereafter, published the recording for the jury's consideration.

¶ 32          In his statement to the police, Matthew repeated the details of defendant's knife attack four times, and he stated three times that defendant's motive was to retaliate for the beating Renee inflicted on Davis. Matthew also stated that defendant "was a real big alcoholic, and that's all he does now is drink." Matthew denied that on the night of the stabbing, any conflict existed between defendant and Johnny.

¶ 33                                    c. Cross-Examination

¶ 34          Matthew admitted that, once or twice, he had threatened to kill himself over Renee—not by using a knife but, rather, by hanging himself. He denied, however, that he ever threatened Renee with a knife. He also denied telling other people that it was Johnny who had cut him and Renee.

¶ 35                                    3. *Renee's Testimony*

¶ 36                                    a. Direct Examination

¶ 37          Renee, who was 24 years old, testified that she had a "rocky relationship" with Matthew from March 2011 to February 2013. In December 2012, they lived together in a two-bedroom house in Charleston. Renee noted that defendant (1) was at their home almost every day and (2) stopped by around 5 p.m. on December 12, 2012. Thereafter, Renee testified consistently with the accounts provided by Johnny and Matthew regarding the circumstances preceding defendant's actions.

¶ 38          Renee noted that after exiting the bathroom with Matthew, they both sat on a loveseat located in their front room. Defendant used the bathroom and returned to where he had been seated. After a while, defendant stood up, took a folding chair that was leaning against a wall, unfolded it, set it behind the loveseat, and sat down. Renee, then stated that "[t]he next thing I remember was something along the lines of [']brother,['] something to do with [']brother,['] and then I felt a sharp pain." Renee then stood up from the loveseat. Defendant was sprawled sideways on a bed, on his back, and Matthew was standing over him, telling her, " 'Call 9-1-1. We need an ambulance. We've both been cut.' " Defendant said, " 'Don't call 9-1-1. It's not that bad, and I'll help.' " Renee told defendant, " [']I'm sorry, I have to call 9-1-1. I think I'm going to need stitches.['] " Matthew continued to say, " 'Call them, call them,' " and he struck defendant. Renee did not see Johnny during this encounter and acknowledged that she did not see who had cut her throat.

¶ 39                              b. Renee's Recorded Interview

¶ 40          The following day, December 13, 2012, Renee provided a statement to the police, which was recorded. The State moved to admit into evidence the second audio track of exhibit No. 28—which contained Renee's statement—and publish it to the jury. After confirming with defense counsel, as well as defendant, that they were stipulating to both the admission and

publication of the second audio track of exhibit No. 28, the trial court granted the State's oral motion.

¶ 41      In her recorded statement, Renee recounted the events of December 12, 2012. Renee also stated the following:  (1) when defendant is intoxicated, he gets violent; (2) defendant's mother told Renee that she had " 'heard stories of other people that had been hurt by [defendant] when he drinks hard alcohol' "; (3) defendant threatened to kill someone if he ever encountered that person; and (4) Matthew told Renee that defendant may have cut their throats because of the fight between Renee and Davis.  Renee denied that any controversy existed between defendant and Johnny.  Renee also disputed that Matthew told defendant he would have to confront him first if defendant wanted to fight Johnny.

¶ 42                              c. Cross-Examination

¶ 43      On cross-examination, Renee noted that in the summer of 2012, Matthew began accusing her of having a physical relationship with defendant.  Despite this claim, Renee stated that Matthew never confronted defendant about his suspicions.

¶ 44                  4. *The Remaining Evidence Presented by the State*

¶ 45      Justin Carder, a Charleston police officer, testified that defendant was arrested a few minutes after the knife attack.  Defendant had a smudge of blood on the left side of his face and on both of his hands.  Carder learned that other people had run out of the Charleston home. Defendant identified those other people as Robert Jones and Darrell Enlow.  As testified to by another Charleston police officer, defendant claimed that Jones and Enlow had slashed the necks of Matthew and Renee.

¶ 46        Forensic deoxyribonucleic acid (DNA) testing revealed that (1) Matthew's DNA was on defendant's face, left hand, and left shoe and (2) Renee's DNA was on defendant's pants. Other DNA samples, including the one from the knife, were unsuitable for comparison.

¶ 47        Alvina Wright testified that she had known Matthew for many years. Two days after the stabbing, she saw Matthew at a local gas station and she asked him what had happened. (The State objected on the ground of hearsay, and the trial court "sustain[ed] the objection for the purpose of showing who cut Matthew's throat," but the court allowed the testimony for the limited purpose of impeaching Matthew's testimony.) Wright stated that Matthew told her that Johnny had cut his throat. (Previously, on cross-examination by defense counsel, Matthew denied telling Wright that Johnny had cut his throat, adding that he did not even know Wright.)

¶ 48                                5. *Defendant's Testimony*

¶ 49        At approximately 5:30 or 6 p.m. on December 12, 2012, defendant stopped by the Charleston home occupied by Matthew and Renee. Observing that a social gathering was occurring, defendant decided to stay. Defendant noted that along with Matthew and Renee, Johnny was at the home as well as others who visited throughout the evening. At one point, defendant answered a knock at the door. As he did so, defendant took the miniature baseball bat that he customarily carried around with him, instead of the knife in the living room. Apparently, one of the guests brought hydrocodone pills, which were being pulverized in the kitchen. Defendant observed (1) Matthew and Renee snorting the hydrocodone powder and drinking alcohol; (2) Matthew smoking cannabis and K2; and (3) Johnny drinking alcohol and smoking cannabis and K2. Defendant stated that he was merely drinking alcohol.

¶ 50        Defendant denied forcing Johnny to smoke K2. Previously, on the one and only occasion when defendant tried K2, he almost died, and he would not have forced anyone to

smoke something that had almost killed him. Defendant denied that he (1) was a member of any gang, (2) told Johnny he was a member of a gang, and (3) flashed gang symbols at Johnny. Defendant asserted, instead, that Matthew and Johnny were the ones making gang symbols and claiming to be members of a street gang. Defendant also denied threatening Johnny.

¶ 51 Later that evening, all the guests had left except Johnny and himself. Eventually, Matthew and Renee left the loveseat where they were seated and went into the bathroom together, where they stayed for 20 minutes. This inconvenienced defendant because he had to go to the bathroom. When Matthew and Renee finally reemerged from the bathroom, defendant mentioned that it was bogus to use the bathroom for that purpose when the bedroom was right down the hall. Defendant then used the bathroom, but when he came out, Matthew pulled him to the back room and had a talk with him.

¶ 52 After the talk in the back room, defendant had to use the bathroom again. The radio was on in the living room, and he heard no screaming or nothing unusual. When he came out of the bathroom and returned to the living room, Johnny was nowhere to be seen, and Matthew was bleeding from the neck. Matthew pushed defendant down onto a bed, grazing and bloodying defendant's nose. Renee was screaming at Matthew to get off defendant. She gave Matthew a shove and then ran to a bedroom. This gave defendant the opportunity to run out the back door of the house. Defendant did not see Johnny, although someone (he could not tell who) was running about 10 feet ahead of him.

¶ 53 Defendant admitted telling the police, falsely, that Jones and Enlow had kicked in the door of the house and entered with guns and that he, defendant, had chased them out of the house. Actually, he never saw either of them in the house, and the last time he saw Jones was earlier that afternoon.

¶ 54                    C. The Jury's Verdict and the Trial Court's Sentence

¶ 55          Following argument, the jury convicted defendant of all four counts alleged—that

is, two counts each of attempt (first degree murder) and aggravated battery.  The trial court later

imposed consecutive prison sentences of 16 years on defendant's attempt convictions but did not

impose a sentence on defendant's aggravated battery convictions because the court determined

that these two counts were lesser-included offenses.

¶ 56          This appeal followed.

¶ 57                                II. ANALYSIS

¶ 58          As noted earlier, defendant's only argument on appeal is that he was denied the

effective assistance of counsel.  Specifically, defendant alleges his counsel's decision to stipulate

to the admission of prior consistent statements and bad character evidence during his trial was

reversible error.

¶ 59              A. Defendant's Right to the Effective Assistance of Counsel

¶ 60          In *Maryland v. Kulbicki*, ___ U.S. ___, ___, 136 S. Ct. 2, 2-3 (2015), the United

States Supreme Court discussed the sixth amendment right to the effective assistance of counsel,

as follows:

> "A criminal defendant 'shall enjoy the right … to have the
>
> Assistance of Counsel for his defence.'  U.S. Const., [amend. VI].
>
> We have held that this right requires effective counsel in both state
>
> and federal prosecutions, even if the defendant is unable to afford
>
> counsel.  *Gideon v. Wainwright*, 372 U.S. 335, 344 (1963).
>
> Counsel is unconstitutionally *in*effective if his performance is both
>
> deficient, meaning his errors are 'so serious' that he no longer

functions as 'counsel,' and prejudicial, meaning his errors deprive the defendant of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984)." (Emphasis in original.)

¶ 61 In *People v. Simpson*, 2015 IL 116512, ¶ 35, 25 N.E.3d 601, the Supreme Court of Illinois recently discussed the defendant's burden when raising an ineffective-assistance-of-counsel claim, writing as follows:

"To show ineffective assistance of counsel, a defendant must demonstrate that 'his attorney's representation fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.' *People v. Patterson*, 192 Ill. 2d 93, 107 (2000) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 695 (1984), for this test). A 'reasonable probability' is defined as 'a probability sufficient to undermine confidence in the outcome.' *Strickland*, 466 U.S. at 694. A defendant must satisfy both prongs of the *Strickland* test and a failure to satisfy any one of the prongs precludes a finding of ineffectiveness. *Patterson*, 192 Ill. 2d at 107."

¶ 62 The United States Supreme Court has also cautioned that when reviewing an ineffective-assistance-of-counsel claim, " 'a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " *Woods v. Donald*, 575 U.S. ___, ___, 135 S. Ct. 1372, 1375 (2015) (quoting *Strickland v. Washington*, 466 U.S. 668, 689 (1984)). In *Kulbicki*, the Court criticized a federal court of appeals for having

"indulged in the 'natural tendency to speculate as to whether a different trial strategy might have been more successful.' " *Kulbicki*, __ U. S. at ___, 136 S. Ct. at 4 (quoting *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993)).

¶ 63　　　　The Supreme Court of Illinois has also addressed this subject, writing as follows: "We have also made it clear that a reviewing court will be highly deferential to trial counsel on matters of trial strategy, making every effort to evaluate counsel's performance from his perspective at the time, rather than through the lens of hindsight." *People v. Perry*, 224 Ill. 2d 312, 344, 864 N.E.2d 196, 216 (2007).　The Supreme Court of Illinois has also provided the following guidance:　"[I]n order to establish deficient performance, the defendant must overcome the strong presumption that the challenged action or inaction may have been the product of sound trial strategy.　[Citations.]　Matters of trial strategy are generally immune from claims of ineffective assistance of counsel."　(Internal quotation marks omitted.)　*People v. Manning*, 241 Ill. 2d 319, 327, 948 N.E.2d 542, 547 (2011).

¶ 64　　　　B. Concerns That Arise in Direct Appeals in Which Defendants
　　　　　　　　Argue They Received Ineffective Assistance of Counsel

¶ 65　　　　　　　　　1. *The* Kunze *Doctrine*

¶ 66　　　　Twenty-six years ago, in *People v. Kunze*, 193 Ill. App. 3d 708, 550 N.E.2d 284 (1990), the defendant argued to this court on direct appeal, in part, that he was deprived of his right to the effective assistance of trial counsel because of his counsel's (1) failure to investigate his prior criminal history and (2) incompetence in advising him to exercise his right to testify. After this court noted that the record before it contained no evidence that either addressed these issues or pertained to conversations between the defendant and his trial counsel, the court wrote the following:

- 14 -

"Where, as here, consideration of matters outside of the record is required in order to adjudicate the issues presented for review, the defendant's contentions are more appropriately addressed in proceedings on a petition for post-conviction relief. (Ill. Rev. Stat. 1987, ch. 38, pars. 122-1 through 122-8.) We therefore decline to adjudicate in this direct appeal [defendant's] contentions concerning the alleged incompetence of [defendant's] trial counsel. An adjudication of a claim of ineffective assistance of counsel is better made in proceedings on a petition for post-conviction relief, when a complete record can be made and the attorney-client privilege no longer applies." *Id.*

¶ 67                              2. *Cases Following* Kunze

¶ 68         The Illinois Appellate Courts have widely followed the *Kunze* doctrine. See, *e.g.*, *People v. Kirklin*, 2015 IL App (1st) 131420, ¶ 127, 29 N.E.3d 481 ("[a] collateral proceeding is generally a better forum for adjudication of ineffective assistance claims"); *People v. Clark*, 406 Ill. App. 3d 622, 640, 940 N.E.2d 755, 772 (2010) (Second District: "[c]laims of ineffective assistance of trial counsel are preferably brought on collateral review rather than direct appeal"); *People v. Pelo*, 404 Ill. App. 3d 839, 870-71, 942 N.E.2d 463, 490 (2010) (Fourth District: because the record before the appellate court contained nothing to review regarding defense counsel's trial strategy relating to an instruction limiting other-crimes evidence, the appellate court was unwilling to deem counsel's failure to submit a limiting instruction ineffective assistance and instead would await the defendant's pursuit of such a claim under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2008))); *People v. Richardson*,

401 Ill. App. 3d 45, 48, 929 N.E.2d 44, 47 (2010) (First District: "Where information not of record is critical to a defendant's claim [of ineffective assistance of trial counsel], it must be raised in a collateral proceeding."); *People v. Parker*, 344 Ill. App. 3d 728, 737, 801 N.E.2d 162, 169 (2003) (Third District: " 'Where the disposition of a defendant's ineffective[-]assistance[-]of[-]counsel claim requires consideration of matters beyond the record on direct appeal, it is more appropriate that the defendant's contentions be addressed in a proceeding for postconviction relief, and the appellate court may properly decline to adjudicate the defendant's claim in his direct appeal from his criminal conviction." (quoting *People v. Burns*, 304 Ill. App. 3d 1, 11, 709 N.E.2d 672, 680 (1999))); *People v. Calvert*, 326 Ill. App. 3d 414, 421-22, 760 N.E.2d 1024, 1030 (2001) (Fourth District: because the record before the appellate court contained nothing to review with respect to why defense counsel stipulated to the State's use of the defendant's prior aggravated battery conviction for impeachment purposes, the appellate court declined to consider the defendant's ineffective-assistance-of-counsel claim on direct appeal and instead invited the defendant to pursue his claim under the Act); *People v. Holloman*, 304 Ill. App. 3d 177, 186, 709 N.E.2d 969, 975 (1999) (Fourth District: Because "the record is devoid of factual findings on the issues pertinent to defendant's claim" of ineffective assistance of counsel, we "decline the opportunity to consider these questions. Rather, defendant may pursue his claim under the [Act] [citation]."); *People v. Flores*, 231 Ill. App. 3d 813, 828, 596 N.E.2d 1204, 1214 (1992) (Fourth District: "Without any explanation from defendant's trial counsel ***, it is extraordinarily difficult [for this court] to conclude *** that *** counsel's trial level omissions do not constitute areas 'involving the exercise of judgment, discretion[,] or trial tactics' " (quoting *People v. Mitchell*, 105 Ill. 2d 1, 12, 473 N.E.2d 1270, 1275 (1984))).

¶ 69        Some decisions of the appellate court have referred to a decision of the United

States Supreme Court, *Massaro v. United States*, 538 U.S. 500 (2003), in which that Court

provided a thorough analysis regarding why it is almost always preferable that ineffective-

assistance claims be considered on collateral review rather than on direct appeal.  In *People v.*

*Durgan*, 346 Ill. App. 3d 1121, 1141-42, 806 N.E.2d 1233, 1249 (2004), the Fourth District

Appellate Court cited *Kunze* and *Massaro*, as well as *Holloman*, in declining to consider the

defendant's ineffective-assistance argument on direct appeal and indicated instead that the

defendant could pursue his claim under the Act.  At issue in *Durgan* was defendant's claim that

trial counsel was ineffective because he failed to file a motion to suppress evidence.  *Id*. at 1142,

806 N.E.2d at 1250.  In rejecting this argument, the appellate court noted that "the argument

defendant makes is almost never appropriate on direct appeal because absent a motion to

suppress, it is highly unlikely that the State would garner its resources to prove the propriety of

the officers' actions."  *Id.*

¶ 70        In *People v. Bew*, 228 Ill. 2d 122, 886 N.E.2d 1002 (2008), the Illinois Supreme

Court addressed the defendant's claim that her counsel was ineffective for failing to file a motion

to suppress evidence.  The Third District Appellate Court in *Bew*, in an order (*People v. Bew*,

No. 3-03-0779 (Dec. 21, 2006) (unpublished order under Supreme Court Rule 23)), had agreed

with that claim, reversed the defendant's conviction, and remanded for a new trial.  *Bew*, 228 Ill.

2d at 124, 886 N.E.2d at 1004.  The supreme court reversed the Third District and, citing

*Massaro*, held that the record on direct appeal was insufficient to address the argument for

suppression of evidence.  *Id*. at 135, 886 N.E.2d at 1009.  The *Bew* court concluded, as follows:

"Therefore, even though we find that defendant has, on this record, failed to prove ineffective

assistance of counsel, we note that defendant may raise these alternative grounds for suppression

under the [Act] [citation].  This disposition allows both defendant and the State an opportunity to develop a factual record bearing precisely on the issue."  (Internal quotation marks omitted.) *Id.* at 135, 886 N.E.2d at 1009-10.

¶ 71      C. Types of Cases in Which Defendants Argue That They
Received Ineffective Assistance of Counsel

¶ 72    To clarify which direct appeals raising ineffective assistance of counsel may be appropriately addressed by an appellate court, we suggest that such cases be divided into three separate categories, which we describe as follows:

     • Category A cases:  direct appeals raising ineffective assistance of counsel that the appellate court should decline to address.

     • Category B cases:  direct appeals raising ineffective assistance of counsel that the appellate court may address because they are clearly groundless.

     • Category C cases:  direct appeals raising ineffective assistance of counsel that an appellate court may address because trial counsel's errors were so egregious.

¶ 73    1. *Category A Cases: Direct Appeals Raising Ineffective Assistance of
Counsel That an Appellate Court Should Decline To Address*

¶ 74    Category A cases are direct appeals in cases like *Kunze* and its progeny, in which, for various reasons, the appellate court concludes that the record on appeal is not adequate to resolve the defendant's contention.  Experience shows that Category A cases comprise a very large percentage of the direct appeals raising ineffective assistance of counsel, which should

come as no surprise.  After all, most such claims raise (at least implicitly) the following questions regarding what defense counsel allegedly did wrong:  (1) What did defense counsel tell the defendant and what specific suggestions or questions did counsel raise?; (2) What concerns did the defendant express to his counsel?; (3)  If the defendant made specific requests of his counsel regarding the handling of the case, such as witnesses who could be contacted and called, how specific was defendant and what information in support of these suggestions did he provide to counsel?; (4)  How did counsel respond to any of the suggestions he received from his client?; (5) If counsel took no action in response to such suggestions, why not?; and (6) What overall strategy did defense counsel have for the case, and what tactics did he employ (and why) pursuant to that strategy?

¶ 75        Given the privileged nature of the matters described in the preceding paragraph, it would be most extraordinary for the trial court record on direct appeal to contain *any* information pertinent to any of these questions.  This absence explains why the prudent and judicious course for an appellate court dealing with a defendant's claim of ineffective assistance of counsel on direct appeal is almost always to (1) decline to address the issue (while explaining its reason for doing so), (2) affirm the trial court's judgment, and (3) indicate that the defendant may raise the ineffective-assistance-of-counsel claim in a postconviction petition.  We note again that this action is what the Supreme Court of Illinois took in *Bew*, cited above.

¶ 76        Instead of taking this prudent and judicious course of action, some appellate courts have elected in Category A cases to address the defendant's argument on the merits.  The problem with this course of action is that an appellate court is essentially just guessing at the answers to the many questions that the record does not contain.  Taking this course of action is a disservice to all parties concerned.  Claims of ineffective assistance of counsel are usually raised

only in the most serious cases, and given the high stakes, the parties deserve an adjudication based on a record that is complete and adequate, not on judicial speculation.

¶ 77          We find further support for the *Kunze* approach of not addressing claims of ineffective assistance of counsel on direct appeal in the recent decision of the Seventh Circuit Court of Appeals in *United States v. Flores*, 739 F.3d 337, 340 (7th Cir. 2014), in which that court wrote about the difficulty an appellate court confronts when the trial court record is not adequate for the appellate court to address a defendant's claim that he received ineffective assistance of trial counsel. The Seventh Circuit also noted decisions of the United States Supreme Court that hold that "counsel's strategic choices are presumed to be competent. As a practical matter[,] that presumption cannot be overcome without an evidentiary hearing at which the defendant explains his view of what went wrong and counsel can justify his choices." *Id.*

¶ 78          Unfortunately, the sound policy the Fourth District first applied in *Kunze* has not always been followed. An example is *People v. Campbell*, 332 Ill. App. 3d 721, 773 N.E.2d 776 (2002), in which the defendant, convicted of first degree murder, raised ineffective assistance of his trial counsel in his direct appeal. Specifically, the defendant argued that his trial counsel was ineffective because, among other reasons, he failed to call two disinterested eyewitnesses. *Id.* at 731-32, 773 N.E.2d at 784. The record contained no information (as would almost always be the case) regarding either what defense counsel was told about these witnesses or why he did not call them to testify. *Id.* Nevertheless, the Fourth District Appellate Court erroneously treated this case as a Category B appeal and rejected the defendant's argument on the merits. The court concluded that "none of the testimony which defendant claims [these two witnesses] would have given would have exonerated defendant," and the failure to call them was a matter of trial strategy. *Id.* at 732, 773 N.E.2d at 785.

- 20 -

¶ 79        Campbell then sought *habeas corpus* relief, which the federal district court denied. However, the Seventh Circuit Court of Appeals granted, in part, *habeas corpus* relief. The Seventh Circuit ruled that Campbell presented a reasonable claim in the federal *habeas corpus* proceeding for ineffective assistance of counsel and that the decision of the Fourth District holding otherwise was an unreasonable application of clearly established federal law as determined by Supreme Court precedent. *Campbell v. Reardon*, 780 F.3d 752, 762-72 (7th Cir. 2015). The Seventh Circuit remanded for an evidentiary hearing to be conducted by the federal district court, noting that a hearing was "needed to develop the record on (1) the extent of counsel's actual pretrial investigation and (2) what these witnesses would have said if called to testify at trial." *Id.* at 772. Of course, had the Fourth District in *Campbell* declined to address defendant's ineffective-assistance claim on direct appeal and awaited his filing a postconviction petition, what the Seventh Circuit ordered on remand is precisely the record that a circuit court hearing on a postconviction petition could have developed.

¶ 80        Further, had the Fourth District treated Campbell's appeal as a Category A case (as it should have), then (1) it could have avoided the embarrassment of having the Seventh Circuit deem its decision "an unreasonable application of clearly established federal law as determined by Supreme Court precedent" and (2) the hearing needed to develop an appropriate record to address Campbell's claims would have occurred much earlier, benefitting everyone.

¶ 81        *2. Category B Cases: Direct Appeals Raising Ineffective Assistance of Counsel That the Appellate Court May Address Because They Are Clearly Groundless*

¶ 82        On rare occasions, an appellate court may appropriately address a defendant's argument on direct appeal raising ineffective assistance of counsel because the claim is

groundless. In such a case, answers to the questions mentioned earlier, that the trial court record typically would not address, would not matter because the defendant's claim has no merit.

¶ 83    Some examples of category B cases are the following: *People v. Davis*, 2014 IL App (4th) 121040, ¶ 24, 22 N.E.3d 1167 (to accept the defendant's argument, the trial court would have to conclude that counsel was ineffective for failing to predict the future and to anticipate a United States Supreme Court decision); *People v. Rodriguez*, 2014 IL App (2d) 130148, ¶ 88, 21 N.E.3d 466 (defense counsel's decision not to challenge an alleged discrepancy between Illinois Pattern Jury Instructions, Criminal, Nos. 18.11, 18.12 (4th ed. 2000) and a section of the Criminal Code of 1961 (720 ILCS 5/24-1.2 (West 2010)) did not constitute deficient performance because the IPI instructions accurately stated the law and an objection to the instructions would have lacked merit); and *People v. Shelton*, 401 Ill. App. 3d 564, 584, 929 N.E.2d 144, 163 (2010) (First District: defendant's ineffective-assistance claim based upon defense counsel's alleged failure to call witnesses and introduce certain evidence was rejected on direct appeal where the record showed that defense counsel had in fact done just that).

¶ 84    *3. Category C Cases: Direct Appeals Raising Ineffective Assistance of*
*Counsel That an Appellate Court May Address Because*
*Trial Counsel's Errors Were So Egregious*

¶ 85    On rare occasions, an appellate court can determine that trial counsel's errors were so egregious that the appellate court can determine trial counsel was constitutionally ineffective without requiring further evidence. Such a case arises when answers to the questions discussed earlier in this opinion simply would not matter. The appellate court can determine, based on the record before it, that defendant's trial counsel's representation fell below an objective standard of reasonableness and there is a reasonable probability that, but for counsel's errors, the result of the

proceeding would have been different. *People v. Patterson*, 192 Ill. 2d 93, 107, 735 N.E.2d 616, 626 (2000). In addition, for a case to fit within Category C, the appellate court must be able to conclude that because no justifiable explanation by trial counsel for his errors could possibly exist, the court need not bother obtaining a record in which such an explanation might be forthcoming.

¶ 86 A prime example of a case in which trial counsel's error was so egregious as to constitute clear ineffective assistance based solely upon the record on direct appeal is the recent decision of the Supreme Court of Illinois in *People v. Simpson*, 2015 IL 116512, ¶ 1, 25 N.E.3d 601, in which the supreme court affirmed a decision of the First District Appellate Court that had reversed the defendant's conviction and remanded for a new trial, concluding that the defense counsel was ineffective. At the defendant's first degree murder trial, a witness testified that he was near the crime scene on the date of the murder but did not recall what the defendant said to him or what he told the police that night. *Id.* ¶ 14. "The State then admitted [the witness's] videotaped statement to police in which he stated that defendant told him that he had hit the victim 30 times with a bat. The State emphasized the statement in its closing argument." *Id.* ¶ 1. The Supreme Court agreed that defense counsel was ineffective in failing to object to the introduction of the witness's statement where the "personal knowledge" requirement for admission of a prior inconsistent statement was not satisfied under section 115-10.1(c)(2) of the Code of Criminal Procedure of 1963 (*id.* (citing 725 ILCS 5/115-10.1(c)(2) (West 2010))).

¶ 87 An earlier example of a case in which trial counsel's error was sufficiently egregious as to constitute clear ineffective assistance based solely upon the record on direct appeal is the Second District's decision in *People v. Fillyaw*, 409 Ill. App. 3d 302, 948 N.E.2d 1116 (2011). In that case, trial counsel (as in *Simpson*) obviously did not understand the

admissibility of prior inconsistent statements as substantive evidence under section 115-10.1 of the Code of Criminal Procedure of 1963 and failed to object when the State confronted one of its witnesses with his signed statement (inconsistent with his trial testimony) in which the witness wrote that, among other things, defendant Fillyaw told the witness that Fillyaw went to rob some people, kicked the door down, started shooting, and shot three people. *Id*. at 308-09, 948 N.E.2d at 1125. Of course, the witness was not present to actually see any of these actions Fillyaw told him about, so he had no "personal knowledge" of these events, as required by section 115-10.1. The Second District ultimately concluded that defendant had demonstrated the ineffective assistance of his trial counsel, reversed his conviction, and remanded for a new trial. *Id*. at 317, 948 N.E.2d at 1131.

¶ 88           D. Determining Into Which Category Defendant's Ineffective-Assistance-
                         of-Counsel Claim Should Be Placed

¶ 89           Although at first blush it is not clear why defendant's trial counsel agreed to the admission of the video recordings at issue in this case, given defendant's assertion that those recordings contained prior consistent statements and bad character evidence, we nonetheless conclude that this case is a Category A appeal. In other words, it is a direct appeal raising ineffective-assistance-of-counsel claims that this court should decline to address. That is because the record before us, like the very large percentage of other direct appeals raising this claim, is not adequate for this court to resolve it. The record contains no indication whatsoever why defense counsel agreed to the admission of the video recordings in question. To resolve defendant's claim, this court would need to guess at counsel's motivation. For reasons earlier discussed in this opinion, we decline to do so.

¶ 90           In reaching this conclusion, we are mindful of the previously mentioned decisions of the United States Supreme Court and the Supreme Court of Illinois holding that (1) matters of

trial strategy are generally immune from claims of ineffective assistance of counsel and (2) a defendant must overcome the strong presumption that the challenged action or inaction may have been the product of sound trial strategy. See, *e.g.*, *Manning*, 241 Ill. 2d at 327, 948 N.E.2d at 267.

¶ 91 We reiterate that for a direct appeal to be deemed a Category C case, no justifiable explanation by trial counsel for his errors could possibly exist. Thus, in the present case, we would need to conclude that *any* answer to the question as to why defendant's trial counsel agreed to the admission of the video recordings simply would not matter. We cannot so conclude.

¶ 92 Accordingly, we deem the prudent and judicious course of action in this case is (1) to decline to address defendant's ineffective-assistance-of-counsel claim in this direct appeal, (2) to affirm defendant's convictions and sentences, and (3) paraphrasing the language used by the Supreme Court of Illinois in *Bew*, to note that defendant may raise his claim pursuant to the Act. If defendant were to take that course of action, then an opportunity to develop a factual record bearing precisely on the issue in question would be available.

¶ 93                                III. CONCLUSION

¶ 94 For the reasons stated, we affirm the trial court's judgment.

¶ 95 Affirmed.

¶ 96       JUSTICE APPLETON, dissenting:

¶ 97       For two reasons, I respectfully dissent from the majority's decision. First, delaying the adjudication of defendant's claim of ineffective assistance of counsel until a postconviction proceeding is inconsistent with binding precedent from the supreme court. Second, the record on appeal shows ineffective assistance.

¶ 98       Allow me to explain those reasons one at a time.

¶ 99       I. BECAUSE THE CLAIM IS BASED ON WHAT TRIAL COUNSEL DID ON THE RECORD, THE TIME TO RAISE THE CLAIM IS NOW, NOT LATER

¶ 100      If a constitutional claim "could have been *** raised" in the direct appeal, the doctrine of procedural forfeiture bars the claim in a subsequent postconviction proceeding. *People v. Kokoraleis*, 159 Ill. 2d 325, 328, 637 N.E.2d 1015, 1017 (1994). "An ineffective assistance of counsel claim permits no wholesale departure from [that principle]." *Id.* If the record on appeal affords the means of raising a claim of ineffective assistance, the defendant must raise the claim on direct appeal, on pain of forfeiting the claim. *People v. Tate*, 2012 IL 112214, ¶ 14, 980 N.E.2d 1100.

¶ 101      The crucial question for our purposes is, What is a claim of ineffective assistance that "could have been *** raised" in the direct appeal? *Kokoraleis*, 159 Ill. 2d at 328, 637 N.E.2d at 1017. The supreme court has laid down the following rule. A claim of ineffective assistance "based on what the record discloses counsel did, in fact, do is subject to the usual procedural default rule." *Tate*, 2012 IL 112214, ¶ 14, 980 N.E.2d 1100. By contrast, a claim of ineffective assistance based on what counsel ought to have done, but failed to do, is not subject to the rule of procedural forfeiture if the claim "depend[s] on proof of matters which could not have been included in the record precisely because of the allegedly deficient representation."

- 26 -

*People v. Erickson*, 161 Ill. 2d 82, 88, 641 N.E.2d 455, 459 (1994).  To quote *Erickson* more fully:

> "[T]he default may not preclude an ineffective-assistance claim for what trial counsel allegedly ought to have done in presenting a defense.  [Citations.]  An ineffective-assistance claim based on what the record on direct appeal discloses counsel did in fact do is, of course subject to the usual procedural default rule.  [Citation.]  But a claim based on what ought to have been done may depend on proof of matters which could not have been included in the record precisely because of the allegedly deficient representation.  [Citation.]"  *Id*. at 88, 641 N.E.2d at 458-59.

See also *People v. West*, 187 Ill. 2d 418, 427, 719 N.E.2d 664, 670 (1999); *Kokoraleis*, 159 Ill. 2d at 328-29, 637 N.E.2d at 1017.

¶ 102       For example, in one of the cases the majority cites, *Bew*, the defendant claimed, on direct appeal, that his trial counsel had rendered ineffective assistance by *omitting to do something*, namely, file a motion for suppression of evidence.  *Bew*, 228 Ill. 2d at 124, 886 N.E.2d at 1004.  Because no motion for suppression ever had been filed, the supreme court found the record to be insufficient to address either party's argument on the issue of ineffective assistance.  *Id.* at 134, 886 N.E.2d at 1009.  The supreme court added, however, that the defendant was free to pursue his claim in a postconviction proceeding, in which an adequate factual record could be developed.  *Id.* at 135, 886 N.E.2d at 1009-10; see also *People v. Henderson*, 2013 IL 114040, ¶ 22, 989 N.E.2d 192 ("*Bew* and *Massaro* demonstrate that where, as here, the defendant's claim of ineffectiveness is based on counsel's failure to file a suppression

motion, the record will frequently be incomplete or inadequate to evaluate that claim because the record was not created for that purpose.").

¶ 103 In another case the majority cites, *Campbell*, the Seventh Circuit remanded the case for an evidentiary hearing on an alleged *omission* by defense counsel: the failure to interview some witnesses who would have given testimony favorable to the defendant. *Campbell*, 780 F.3d at 772. The defendant's claim of ineffective assistance depended on proof of what the witnesses would have said on the stand—proof that was absent from the record precisely because of the alleged ineffective assistance, *i.e.*, the failure to interview them and call them as witnesses in the trial.

¶ 104 The present case is different from *Bew* and *Campbell* in that the ineffective assistance is something trial counsel *did*, on the record. He explicitly agreed, on the record, to the admission and publication of the CDs containing the statements that Johnny Price, Matthew Price, and Renee Strohl had made to the police. It would be untenable for defendant to say that his claim "depend[s] on proof of matters which could not have been included in the record precisely because of the allegedly deficient representation." *Erickson*, 161 Ill. 2d at 88, 641 N.E.2d at 459. Consequently, *Kokoraleis* and its progeny give him no choice but to raise the claim of ineffective assistance now, in his direct appeal. If defendant had waited until the postconviction proceeding, the State would have filed a motion for dismissal on the ground of procedural forfeiture—and rightfully so: the alleged acts of ineffective assistance were memorialized in the record on direct appeal. "Reason to relax the bar [of procedural forfeiture] occurs only when what is offered in the papers [attached to the postconviction petition] also explains why the claim it supports could not have been raised on direct appeal." *Id.* at 87-88, 641 N.E.2d at 458. Considering the nature of his claim of ineffective assistance, I cannot

imagine what evidence defendant would need to attach to his postconviction petition beyond that which already is in the transcript of the trial. See *People v. Schaff*, 281 Ill. App. 3d 290, 296, 666 N.E.2d 788, 791 (1996) (In the affidavits attached to his postconviction petition, "[The] [d]efendant presents no evidence to support the claim of ineffective assistance which is not found in the trial record."). His claim is based on agreements or stipulations that defense counsel made on the record, and thus the claim can be adjudicated now.

¶ 105     By delaying the adjudication of defendant's claim—and claims like his—until a postconviction proceeding, the majority not only prescribes a "wholesale departure from" the rule of procedural forfeiture (*Kokoraleis*, 159 Ill. 2d at 328, 637 N.E.2d at 1017) and delays the administration of justice, but the majority also puts the office of the State Appellate Defender in a dilemma. On the one hand, the supreme court tells appellate counsel: "An ineffective assistance claim based on what the record on direct appeal discloses counsel did in fact do is, of course, subject to the usual procedural default rule." *Erickson*, 161 Ill. 2d at 88, 641 N.E.2d at 459. On the other hand, the majority tells appellate counsel that only "[o]n rare occasions" (*supra* ¶ 85) may the appellate court appropriately address a defendant's argument on direct appeal raising ineffective assistance of counsel (*supra* ¶ 85) and that even in cases such as this one—cases premised on what trial counsel *did*, on the record—the claim must be put off until a postconviction proceeding.

¶ 106     Buffeted by these opposing directives, what is an appellate counsel to do? Wasteful hedging: that is what an appellate counsel must do. To be safe, appellate counsel has to raise the claim on direct appeal, in obedience to *Erickson*. Then, in obedience to the *Kunze* line of cases, appellate counsel has to raise the claim again, in a postconviction proceeding. Consequently, the office of the State Appellate Defender, an already overburdened agency, has

to do double the work—which would be unnecessary if appellate counsel could count on us to follow the aforementioned cases from the supreme court.

¶ 107                                  II. INEFFECTIVE ASSISTANCE

¶ 108          Having explained why, in my opinion, it is a mistake to shunt off defendant's claim of ineffectiveness to a postconviction proceeding, I now will explain why I consider his claim to have merit.

¶ 109          A claim of ineffective assistance has two elements:  (1) deficient performance and (2) resulting prejudice.  *People v. Minniefield*, 2014 IL App (1st) 130535, ¶ 70, 25 N.E.3d 34.  I will organize my discussion accordingly.

¶ 110                                  A. Deficient Performance

¶ 111          Defense counsel's performance was deficient if it was "objectively unreasonable under prevailing professional norms."  (Internal quotation marks omitted.)  *Id.* ¶ 71.

¶ 112          It *can* be objectively unreasonable of defense counsel to agree to the admission of inadmissible evidence (*People v. Fillyaw*, 409 Ill. App. 3d 302, 315, 948 N.E.2d 1116, 1130 (2011)), but it is not *always* objectively unreasonable of defense counsel to do so.  It might appear, at the time, that the inadmissible evidence stands to benefit the defense more than hurt it, in which case defense counsel could legitimately make a tactical decision to refrain from objecting.  *People v. Graham*, 206 Ill. 2d 465, 478-79, 795 N.E.2d 231, 240 (2003); *People v. Jackson*, 2013 IL App (3d) 120205, ¶ 29, 2 N.E.3d 374.  We should allow "wide latitude" for such tactical decisions (*People v. Cunningham*, 376 Ill. App. 3d 298, 301, 875 N.E.2d 1136, 1140 (2007)), looking at all the circumstances from defense counsel's perspective at the time (*People v. Nowicki*, 385 Ill. App. 3d 53, 82, 894 N.E.2d 896, 924 (2008)).

¶ 113        While being careful to avoid the false superiority of hindsight (*People v. Mabry*, 398 Ill. App. 3d 745, 753, 926 N.E.2d 732, 739 (2010)), we should expect *something* of tactical decisions. We should not treat them as categorically sacrosanct or immune from scrutiny. Even a tactical decision, such as a decision not to object (*People v. Perry*, 224 Ill. 2d 312, 344, 864 N.E.2d 196, 210 (2007)), has to be "objectively reasonable." (Internal quotation marks omitted.) *People v. Manning*, 241 Ill. 2d 319, 343, 948 N.E.2d 542, 556 (2011); see also *People v. Simpson*, 2013 IL App (1st) 111914, ¶ 19, 993 N.E.2d 527; *People v. Moore*, 2012 IL App (1st) 100857, ¶ 53, 964 N.E.2d 1276. A reviewing court decides *de novo* (*People v. Hale*, 2013 IL 113140, ¶ 15, 996 N.E.2d 607; *People v. Morris*, 2013 IL App (1st) 111251, ¶ 116, 997 N.E.2d 847) whether a defendant has rebutted the presumption that refraining from objecting could be considered, under the circumstances, to be a sound trial strategy (*People v. Macias*, 2015 IL App (1st) 132039, ¶ 82, 36 N.E.3d 373).

¶ 114        A logical preliminary question would be whether the statements Johnny Price, Matthew Price, and Renee Strohl made to the police were indeed objectionable under the rules of evidence, since professionally reasonable performance does not entail the making of unmeritorious objections. See *People v. Nieves*, 193 Ill. 2d 513, 527, 739 N.E.2d 1277, 1284 (2000) (no ineffective assistance if "any objection *** would rightfully have been overruled"). According to defendant, the CDs were objectionable on two grounds: (1) they consisted (for the most part) of prior consistent statements, *i.e.*, statements substantially identical to those the witnesses already had made in their testimony on direct examination; and (2) they referred to uncharged bad acts and bad character traits of defendant.

¶ 115        Both (1) and (2) would have been valid objections if defense counsel had made them in the jury trial. I will explain why.

¶ 116                    1. *Prior Consistent Statements*

¶ 117          Generally, a prior consistent statement is inadmissible hearsay. *People v. House*, 377 Ill. App. 3d 9, 19, 878 N.E.2d 1171, 1179 (2007). I use the qualifier "generally" because there are two exceptions to that rule. A prior consistent statement is admissible "(1) where the prior consistent statement rebuts a charge that a witness is motivated to testify falsely, and (2) where the prior consistent statement rebuts an allegation of recent fabrication." *Id.*

¶ 118          "Under the first exception, the prior consistent statement is admissible if it was made before the motive to testify falsely came into existence." *Id.* In other words, at the time the declarant made the prior consistent statement, the declarant lacked any motive to tell a lie. The declarant developed that motive only later, after the prior consistent statement.

¶ 119          "Under the second [exception], a prior consistent statement is admissible if it was made prior to the alleged fabrication." *Id.*

¶ 120          The idea behind both exceptions is that a witness who has been accused of dishonesty can be rehabilitated by showing that the witness made the same statement earlier, when the witness lacked any motive to be dishonest. This rehabilitation would be a sham—a pretext to convince the jury by repetition—if earlier, when the witness made the prior consistent statement, the witness had the same motive to be dishonest that the witness has now. A prior consistent statement is admissible only if it was "made before the motive to fabricate arose." *People v. Harris*, 123 Ill. 2d 113, 139, 526 N.E.2d 335, 346 (1988).

¶ 121          The State does not invoke either of those exceptions to the rule against prior consistent statements. As far as I can see, there is no reason to suppose that Johnny Price, Matthew Price, and Renee Strohl had a motive to fabricate that arose *after* they made their statements to the police. If they had a motive to fabricate, they would have had that motive from

- 32 -

the start.  The CDs, instead of being truly rehabilitative, were intended to bolster their credibility with hearsay.  Because the CDs contained inadmissible hearsay in the form of prior consistent statements, they were objectionable on that ground.  See Ill. R. Evid. 802 (eff. Jan. 1, 2011).

¶ 122                    2. *Uncharged Bad Acts and Bad Character Traits*

¶ 123          "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith except" as provided in various sections of the Code of Criminal Procedure (725 ILCS 5/115-7.3, 115-7.4, 115-20 (West 2012)), none of which are applicable here.  Ill. R. Evid. 404(b) (eff. Jan. 1, 2011).

¶ 124          Likewise, "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion," except that, in a criminal case, an accused may offer evidence of his or her own "pertinent trait of character," after which the prosecution may "rebut the same."  Ill. R. Evid. 404(a), (a)(1) (eff. Jan. 1, 2011); see also *People v. Pennington*, 2015 IL App (1st) 132354, ¶¶ 83-84; *People v. Randle*, 147 Ill. App. 3d 621, 625, 498 N.E.2d 732, 736 (1986) ("[C]haracter evidence offered by the prosecution to show the accused's propensity to violence is generally inadmissible because the danger of unfair prejudice to the defendant in being portrayed as a 'bad man' substantially outweighs the probative value of the evidence.  [Citation.]  Such evidence of bad character may be introduced by the prosecution only if the defendant first opens the door by introducing evidence of good character to show that he is a quiet and peaceful person.").

¶ 125          Defendant argues the CDs were inadmissible not only because they abounded in prior consistent statements but also because they accused him of uncharged bad acts and bad character traits.

¶ 126    Specifically, defendant refers to the following representations in Johnny Price's recorded statement to the police: (1) defendant claimed to be a member of the Latin Kings, a street gang, and wanted Johnny Price to make gang signs; (2) he forced Johnny Price to consume narcotics; (3) he had "problems" with Johnny Price; and (4) he cut Strohl's throat and chased after Johnny Price because he wanted to kill all the witnesses.

¶ 127    As for Matthew Price's recorded statement, defendant argues he "made the unfairly prejudicial comment that defendant 'was a real big alcoholic, and that's all he does now is drink.' "

¶ 128    Finally, defendant argues that Renee Strohl, in her recorded statement, made the following unfairly prejudicial comments about his character: (1) "I don't like [defendant] coming to my house whenever he's intoxicated because he gets violent. His mother has told me, I've never experienced anything up until today, heard stories of other people that had been hurt by him when he drinks hard alcohol"; (2) shortly before the incident, defendant's mother "called and asked me to tell [defendant] that he had court at [9 a.m.] and if he was going to be home. And[] I said, [']Blackie[,] you have court at nine.[']  And he said, [']I'm gonna be home by 10['] "; (3) during the evening hours, defendant asked Strohl to invite Lizzie G. over because he wanted to have sex with her; (4) "The only thing that [defendant] said to me that made me angry was he told me that that Lizzie girl had given him [oral sex] on my daughter's bed, and he was like[,] ['G]ive me a high five,['] and I just said[,] ['L]ook, I told you I did not want anybody doing anything on that bed['] "; and (5) defendant "talked about if Derrall Enlow would come to the house[,] [defendant] would for certain kill him and he wouldn't clean up any of the blood."

¶ 129    The State argues the evidence of uncharged bad acts of which defendant complains was admissible because these bad acts were "intertwined" with the charged offenses,

*i.e.*, the cutting of Matthew Price's and Renee Strohl's throats, and "provided the background for the events immediately surrounding the charged conduct."

¶ 130         Evidence of other bad acts can be admissible if, without such evidence, things people did at the time of the offense would seem implausible or inexplicable. *People v. Rutledge*, 409 Ill. App. 3d 22, 26, 948 N.E.2d 305, 308 (2011); *People v. Carter*, 362 Ill. App. 3d 1180, 1190, 841 N.E.2d 1052, 1060 (2005); *People v. Manuel*, 294 Ill. App. 3d 113, 124, 689 N.E.2d 344, 351-52 (1997).  In other words, evidence that the defendant committed uncharged wrongs can be admissible if such evidence provides a necessary background to people's behavior at the time of the charged crime—behavior that otherwise would make no sense to the jury.  In that case, the evidence of other bad acts would be offered not to prove that the defendant is a wicked person who, by nature, is prone to commit crime; rather, the evidence would be offered to present a coherent, logically intelligible narrative of the charged crime.  *Carter*, 362 Ill. App. 3d at 1191, 841 N.E.2d at 1060-61.

¶ 131         That does not mean the evidence is *automatically* admissible for that purpose.  I have tried to be careful to say that, for the sake of presenting a coherent narrative, the evidence of other bad acts *can be* admissible, because even when evidence of other bad acts has a relevant purpose other than to show the defendant's propensity to commit crime, the trial judge must weigh the probative value of the evidence against its unfairly prejudicial effect.  *People v. Illgen*, 145 Ill. 2d 353, 365, 583 N.E.2d 515, 519 (1991).

¶ 132         Weighing probative value against unfair prejudice, the trial court probably would have overruled a propensity objection to defendant's alleged remark that he would kill Derrall Enlow if he entered the house, because that remark explained why defendant allegedly picked up

- 35 -

the steak knife from the TV table when he went to answer the back door (apparently, he wanted to be prepared in case it was Enlow who was knocking).

¶ 133        Likewise, the trial court probably would have overruled a propensity objection to defendant's allegedly chasing Johnny Price, because chasing him arguably showed a desire to intercept or eliminate witnesses—a desire defendant would have had only if he knew he was guilty of cutting Matthew Price's and Renee Strohl's throats.  In that regard, the purpose would have been to show a consciousness of guilt, not a propensity to commit crime.  "Evidence of other crimes is admissible if it is relevant for *any* purpose other than to show the defendant's propensity to commit crime."  (Emphasis added.)  *People v. Pikes*, 2013 IL 115171, ¶ 11, 998 N.E.2d 1247.

¶ 134        I do not see, though, how defendant's alleged declaration of membership in the Latin Kings and his forcing Johnny Price to smoke K2 were probative of anything other than defendant's supposed aggressive, violent, unsavory character.  It would be one thing if Johnny Price told the police, unequivocally:  "Defendant wanted me to make gang signs, but I refused to do so, and he forced me to smoke K2, but one hit is all I would take.  He became irate at me because of these refusals, and he threatened to beat me up.  That's when Matthew Price told him, 'You'll have to go through me first.' "  If Johnny Price had told the police that, one might infer that defendant "went through" Matthew Price by cutting his throat, in which case what happened before would have been necessary to a coherent narrative.  See *Carter*, 362 Ill. App. 3d at 1191, 841 N.E.2d at 1060-61.  But Johnny Price merely told the police that defendant had unspecified "problems" with him, and Johnny Price only speculated that defendant threatened to beat him up, and he only speculated that Matthew Price replied that defendant would have to go through him first ("that's what I'm guessing they said").  That Johnny Price could only speculate what

defendant and Matthew Price told one another regarding him—if indeed they had any conversation at all regarding him—made the probative value of these other bad acts low compared to the unfair prejudice to defendant.

¶ 135     That defendant had been known to hurt people when he got drunk was blatant propensity evidence, and if defense counsel had objected to it, there would have been nothing to weigh.  The only possible function of this evidence was to suggest that, as someone who had a known history of hurting people when drunk, defendant was just the type of person who would cut the throats of Matthew Price and Renee Strohl in a drunken rage.

¶ 136     It is unclear that the remaining evidence of which defendant complains even qualifies as "other crimes, wrongs, or acts."  Ill. R. Evid. 404(b) (eff. Jan. 1, 2011).  The court date his mother called about could have been in a civil matter.  And as for his eagerness to have sex with Lizzie G., it seems unlikely a jury would think, "Since he's crude and licentious, he's just the sort of person who would cut someone's throat."

¶ 137     But membership in the Latin Kings, forcing someone to smoke a dangerous narcotic, and being a violent drunk clearly were bad acts or bad character traits.  See *id.*; Ill. R. Evid. 404(a)(1) (eff. Jan. 1, 2011).  I can discern no strategic reason to acquiesce to the presentation of that inadmissible and unfairly prejudicial evidence.

¶ 138     Again, whether to object is a strategic decision.  *Perry*, 224 Ill. 2d at 344, 864 N.E.2d at 210.  Although we should give "wide latitude" to strategic decisions (*Cunningham*, 376 Ill. App. 3d at 301, 875 N.E.2d at 1140), we should expect them to be "objectively reasonable" (internal quotation marks omitted) (*Manning*, 241 Ill. 2d at 343, 948 N.E.2d at 556).  I realize that just because evidence is objectionable, defense counsel does not automatically have to object to it and that, pursuant to a logical strategy, defense counsel could reasonably refrain

from making what would have been a legally meritorious objection. *Graham*, 206 Ill. 2d at 478-79, 795 N.E.2d at 240. Nevertheless, I am unable to see how it was objectively reasonable of defense counsel to agree to the *wholesale* presentation of the statements that Johnny Price, Matthew Price, and Renee Strohl had made to the police. The agreement is inexplicable; it makes no sense.

¶ 139    Defense counsel's stated reason for entering into the agreement was simply fallacious. He reasoned to the trial court that if he used the statements for impeachment, as he intended to do, he would "open the door" anyway and the statements in their entirety would "[come] in." Likewise, the prosecutor alluded to "the doctrine of completeness." Actually, as defendant explains in his brief, the doctrine of completeness makes additional parts of a statement admissible only to the extent necessary to "prevent the jury from being misled, to place the admitted portion in context so that a true meaning is conveyed, or to shed light on the meaning of the admitted portion." *People v. Craigen*, 2013 IL App (2d) 111300, ¶ 46, 997 N.E.2d 743. I do not see how the impeaching parts of the statements would have been misleading in the absence of a presentation of the statements in their entirety.

¶ 140    The all-or-nothing assumption was incorrect. See *People v. Andersch*, 107 Ill. App. 3d 810, 820, 438 N.E.2d 482, 489 (1982). If a witness has been impeached with a prior inconsistent statement, the party who called the witness may bring out additional portions of the statement "to qualify or explain the inconsistency and rehabilitate the witness." *People v. Harris*, 123 Ill. 2d 113, 142, 526 N.E.2d 335, 347 (1988). But any portion of the statement which does not qualify or explain the inconsistency is inadmissible. *Id.*; *Andersch*, 107 Ill. App. 3d at 820, 438 N.E.2d at 489. So, defense counsel was mistaken in his assumption that he would

open the door to the statements in their entirety simply by using excerpts of the statements for impeachment.

¶ 141     There was no strategic reason for stipulating to the admission of the statements in their entirety. The stipulations were objectively unreasonable, and one can only assume that defendant personally consented to the stipulations only on the basis of defense counsel's mistaken understanding of the law.

¶ 142                              B. Resulting Prejudice

¶ 143     A defendant suffers prejudice from the deficient performance of defense counsel if there is a "reasonable probability" that, but for the deficient performance, the outcome of the proceeding would have been more favorable to the defendant. *Minniefield*, 2014 IL App (1st) 130535, ¶ 71, 25 N.E.3d 34. To establish a "reasonable probability," a defendant has to do more than show that the deficient performance had "some conceivable effect on the outcome." *Strickland v. Washington*, 466 U.S. 668, 693 (1984). And, yet the defendant need not go so far as to show that the deficient performance "more likely than not altered the outcome." *Id.* Rather, a "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

¶ 144     The closer the case is, the more likely that defense counsel's deficient performance altered the outcome. See *People v. Butcher*, 240 Ill. App. 3d 507, 510, 608 N.E.2d 496, 498 (1992). This was a close case. Johnny Price, Matthew Price, and Renee Strohl were flawed witnesses.

¶ 145     That Johnny Price, who apparently was in possession of a cell phone, would refrain from calling 9-1-1 is somewhat troubling but perhaps is explainable in that he assumed his grandmother, whom he apparently did call, would call 9-1-1. If Johnny Price, however,

- 39 -

declined Gayla Jenkins's offer to call 9-1-1 (as she testified he did), that is a real problem, considering that, for all Johnny Price knew, his first cousin and his first cousin's girlfriend were at that very moment lying in their front room, bleeding to death. That Jenkins (as she also testified) saw Johnny Price laughing while talking on his cell phone, immediately after he fled the scene of the throat-cutting, could suggest he was not quite as devastated as he at first presented himself to be.

¶ 146 As for Matthew Price, he was a felon, and one can only wonder about his level of consciousness after consuming alcohol, hydrocone powder, cannabis, and K2.

¶ 147 According to Matthew Price, defendant dropped the knife onto the floor when he pushed defendant down onto the bed. Detective Anthony West testified, however, that he found the knife on top of the television table, as pictured in People's exhibit No. 32.

¶ 148 There also was the discrepancy between what Matthew Price told Wright, Tina Broom, and Adriana Pedigo and what he told the jury. It is unclear what motive those three would have had to lie. They all described themselves as Matthew Price's longtime friends, and Pedigo even testified that Matthew Price was like a brother to her. According to Wright's testimony, Matthew Price told her that *Johnny Price* had cut his and Renee Strohl's throats because Johnny Price had given them money to buy drugs for his own use and they had consumed the drugs instead of giving them to him, Johnny Price. Pedigo testified that Matthew Price had told her *three times* it was Johnny Price who had cut his throat. And Broom testified that Matthew Price had told her both defendant *and* Johnny Price were standing behind him when his throat was cut. Thus, the testimony of Matthew Price, a felon and a heavy drug user, was in direct contradiction to what he supposedly had told his friends: Wright, Broom, and Pedigo.

¶ 149        As for Renee Strohl, she admitted she had no idea who had cut her throat. Hydrocone and rum, consumed together, probably did not enhance her alertness.

¶ 150        In short, I would find a reasonable probability that the wholesale presentation of the police statements made a difference in the outcome. "The danger in prior consistent statements is that a jury is likely to attach disproportionate significance to them. People tend to believe that which is repeated most often, regardless of its intrinsic merit, and repetition lends credibility to testimony that it might not otherwise deserve." *People v. Smith*, 139 Ill. App. 3d 21, 33, 486 N.E.2d 1347, 1355 (1985). In their statements to the police, Johnny Price and Matthew Price repeated their accounts again and again. In addition to being influenced by this repetition, the jury could have been inclined to think that a mean drunk who was a member of a street gang was just the sort of person who would cut someone's throat. The record shows prejudice, and I would reverse the trial court's judgment on the ground of ineffective assistance of trial counsel.