2021 IL App (1st) 191899-U

No. 1-19-1899

Order filed May 14, 2021

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County. |
| v. | ) ) | No. 10 CR 19174 |
| ALLAN KUSTOK, | ) ) | Honorable John J. Hynes, |
| Defendant-Appellant. | ) ) | Judge, presiding. |

_____

JUSTICE ROCHFORD delivered the judgment of the court.
Presiding Justice Delort and Justice Hoffman concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The circuit court's grant of the State's motion to dismiss defendant's postconviction petition is affirmed where defendant forfeited his claim of ineffective assistance by failing to raise it on direct appeal and, forfeiture notwithstanding, defendant failed to make a substantial showing of prejudice.

¶ 2    Defendant Allan Kustok appeals from the circuit court's grant of the State's motion to dismiss his postconviction petition at the second stage of proceedings, claiming that the petition made a substantial showing of ineffective assistance of trial counsel. We affirm.

¶ 3 Defendant was charged with six counts of first degree murder (720 ILCS 5/9-1 (West Supp. 2009)) arising from the September 29, 2010 shooting death of his wife, Anita Kustok, at their house in Orland Park, Illinois.

¶ 4 At trial, Patricia Fleming, a registered nurse, testified that she was working at Palos Community Hospital on September 29, 2010. At approximately 6:50 a.m., she saw defendant standing outside holding something wrapped in sheets and blankets that resembled the shape of a person. Fleming went outside and spoke to defendant, who was upset and stated repeatedly that his wife shot herself.

¶ 5 Defendant told Fleming that his wife woke him early that morning because she was concerned someone had tried to break in. Defendant checked the house and told her no one was there. Later that morning, he went to the bathroom, heard a loud explosion, and then found his wife shot. He discharged the remaining bullets from the murder weapon, then laid by her.

¶ 6 On cross-examination, Fleming testified that defendant told her he had purchased a firearm because his wife had asked him to buy it for their anniversary. He did not know the firearm was in the bed that morning.

¶ 7 Dr. Elizabeth Hatfield testified that she was working at the Palos Community Hospital emergency room when defendant arrived with his wife's deceased body wrapped in several sheets and blankets. Defendant told Hatfield that at 3:30 a.m., his wife woke him, said she heard a noise, and asked him to investigate. Defendant checked the house and went back to sleep. She woke him again at 5 a.m. and said she had to be up in 30 minutes. Just before 5:30 a.m., defendant heard a gunshot and saw his wife in a pool of blood. Defendant laid by her. Hatfield asked why defendant

did not call 911, and he said he "knew she was dead." Defendant fired the remaining bullets and then "cleaned her up."

¶ 8    Officer Larry Davids testified that on September 29, 2010, he went to Palos Community Hospital and administered a gunshot residue (GSR) kit on defendant. Defendant told Davids that he went to the bathroom at 5 a.m. and then came back to bed, where his wife said she had another 30 minutes before she had to wake up. Defendant fell asleep, then awoke to "just one bang." He turned, saw blood, and tried to wipe it up. He took the firearm, which was lying on his wife's chest with her right hand over or near it, held it to his head, then fired toward an armoire. Defendant discarded the firearm and used a towel to wipe his wife. He sat and held her, then placed her in the front seat of his vehicle and drove to the hospital. Defendant stated he purchased the firearm for their anniversary, and never before fired it.

¶ 9    Officer Jeff Cavender testified that on September 29, 2010, he arrived at Palos Community Hospital, viewed Mrs. Kustok's body, and found "powder burns" and "starring around the wound," which suggested that the firearm was in "close proximity" to her face when fired. Cavender noticed "reddish-brown dots" on both lenses of defendant's glasses.

¶ 10    Defendant told Cavender that he went to the bathroom at 5 a.m., returned to bed and fell asleep, then woke to a gunshot. He rolled over and saw his wife "with her head to the right facing towards him with her arms across her chest, right over left, a handgun in her right hand." Cavender asked defendant why he did not call for help, and he responded that "he knew his wife would not want a scene there and he knew that she was dead." Defendant said he waited approximately 1½ hours before driving his wife to the hospital. He further stated that he kept his glasses in the bathroom and did not wear them to the bedroom when he returned around 5 a.m. Before leaving

the hospital, Cavender took possession of defendant's clothes, which included scrubs and a t-shirt, and an envelope containing defendant's glasses.

¶ 11 Andre Blue, an evidence technician for the Cook County Sheriff's Police Department, testified that on September 29, 2010, he went to Palos Community Hospital and photographed Mrs. Kustok, administered a GSR kit to her hands, and viewed defendant's glasses, which had reddish-brown spots on the lenses.

¶ 12 Officer Troy Siewert testified that he responded to the Kustok house on September 29, 2010, at approximately 7:11 a.m. He was the first to arrive. The house was empty and showed no signs of forced entry.

¶ 13 Ronald Sachtleben, a crime scene investigator for the Cook County Sheriff's Police Department, testified that he was assigned to the Kustok house on September 29, 2010. He described the condition of the master bedroom that morning, including that the doorframe had a brownish-red substance on it. There were two pillows with apparent "drops of blood" near a nightstand south of the bed, as well as drops of blood on the carpet east of those pillows. The bed had what looked like a "large blood stain" on the northwest corner, and another pillow on top of it. Next to a nightstand north of the bed, there were five stacked pillows, each of which appeared to have bloodstains. One pillow had a hole from which Sachtleben recovered a "copper-jacketed lead projectile."

¶ 14 North of the nightstand, Sachtleben saw a firearm on the floor. On the north wall of the bedroom, he saw an armoire with five bullet holes in it. In the master bathroom, he found a pair of blue shorts, a white mat, two towels in the sink, and two towels in the bathtub, all with apparent bloodstains. Sachtleben also searched the basement and recovered a brown paper bag that

contained a box of 25 live rounds of ammunition from inside a filing cabinet, as well as a "black pistol box" from underneath a tool bench.

¶ 15    Shawn Weiss, a project manager at LabCorp, testified that he conducted DNA analysis on samples from the glasses. Weiss concluded that the glasses had a major female DNA profile from which Mrs. Kustok could not be excluded.

¶ 16    Kelly Krajnik, a forensic scientist for the Illinois State Police, testified that she performed DNA testing on multiple items related to the investigation, including a t-shirt, shorts, two pillowcases, and a firearm. Each item had blood on it that matched Mrs. Kustok's DNA profile. On redirect, Krajnik testified that she did not locate defendant's DNA in the samples from the firearm.

¶ 17    Jeff Parise, a forensic scientist specializing in firearms for the Illinois State Police, testified that in November 2011 he tested the firearm used in the incident. The firearm had single-action and double-action trigger modes and safety measures to prevent it from discharging accidentally. The firearm should not discharge if dropped while in single-action mode.

¶ 18    Mary Wong, a forensic scientist for the Illinois State Police, testified that she received GSR samples from the back of Mrs. Kustok's and defendant's left and right hands. Wong concluded that Mrs. Kustok may not have discharged a firearm with either hand, but that defendant's left-hand sample indicated that he either discharged a firearm, was in the vicinity of a discharged firearm, or contacted a primer GSR-related item.

¶ 19    Dr. Hiliary McElligott testified that she performed Mrs. Kustok's autopsy. Mrs. Kustok was 5'5'' and weighed 130 pounds. She had a gunshot injury to her left cheek. The wound was surrounded by stippling, which indicated that the firearm was discharged "a number of inches"

from her face. Due in part to the lack of soot near the wound, Dr. McElligott concluded that the firearm was discharged 6 to 24 inches from Mrs. Kustok's face, with a trajectory "from the left to the right and slightly downward." The bullet exited the back of Mrs. Kustok's head, on the right side. Dr. McElligott determined that the cause of death was a gunshot wound to the face, and the manner of death was homicide.

¶ 20    Dr. McElligott ruled out suicide and accident as manners of death. She discounted suicide because the gunshot injury was on the left side of Mrs. Kustok's face, the firearm was found in her right hand, and her hand was on her chest. She believed that it was "an unlikely scenario to reach across one's body and fire with the right hand toward the left side of the face." The stippling also indicated that Mrs. Kustok did not commit suicide because self-inflicted gunshot wounds are typically contact wounds. Additionally, Dr. McElligott believed that defendant's presence at the time of the shooting and his delay in requesting medical treatment made suicide unlikely. Dr. McElligott discounted accident as the manner of death for "many" of the same reasons she rejected suicide.

¶ 21    John Riggio, the manager of a gunshop, testified that he sold the firearm to defendant in June 2009. Defendant told Riggio that he was purchasing the firearm for target shooting. Defendant did not mention home defense as reasons for the purchase.

¶ 22    Five witnesses who knew Mrs. Kustok, including her brother, daughter-in-law, friends, and a neighbor, testified that they had no knowledge that she had a firearm in the house. Testimony also demonstrated that Mrs. Kustok was planning a surprise birthday party for her sister for October 2010, had made a doctor's appointment for a date after September 29, 2010, and had not exhibited a noticeable change in her typically positive disposition prior to the incident.

¶ 23    The State introduced testimony from five women with whom defendant had varying degrees of extramarital interaction. Ms. V testified that she had a five-year affair with defendant that was ongoing at the time of the incident, during which defendant expressed dissatisfaction with his marriage. Ms. K testified that she had a sexual encounter with defendant in July 2010. Ms. H testified that she met defendant at a mall in July 2010 and had coffee with him, at which time he stated he was not happy in his marriage. Ms. G testified that she met defendant at a restaurant and had subsequent dates with him in August 2010. During their time together, defendant made sexual advances towards her and relayed that he and the victim were only together for their children and would divorce soon. Ms. R testified that days before the incident, she had lunch with defendant, kissed him afterwards, and made plans for another date.

¶ 24    Rod Englert testified as the State's expert in blood pattern analysis and crime scene reconstruction. On December 16, 2010, Englert created a reconstruction of the shooting in a police garage using the photographs and measurements from the scene. Englert testified that certain bloodstains on the t-shirt defendant wore at the hospital were "consistent with impact spatter from high velocity mist from gunshot," and not consistent with transfer stains, which are "slow" and have no "energy connected" to the stain. Similarly, the shorts recovered from the master bathroom had "individual impact spatter stains consistent with [a] gunshot." Englert also examined a pair of glasses and photographs thereof and concluded that one of the lenses had "the appearance of blood" that was "consistent with *** high energy gunshot impact spatter." The firearm contained impact spatter on each side, which would not occur if the firearm discharged while "laying *** on the surface of the bedding."

¶ 25    Englert concluded that Mrs. Kustok was shot from the north side of the bed. There were no burn marks or soot deposits on the pillow in which the bullet was located, which suggested that the firearm "wasn't laying on [a] pillow when the shot was fired," meaning that the shooting was not accidental. Englert also found no evidence of soot on the "pillow or any of the bedding." Englert believed that had Mrs. Kustok shot herself, high velocity impact blood spatter would have appeared on her arm, which dries very quickly, her arms would not have fallen crossed on her chest with the firearm in her right hand, and her hands likely would have been positive for primer GSR. Accordingly, he ruled out a self-inflicted shot based in part on the spatter patterns and the lack of blood or soot on her hand and arms. He ruled out accident "[b]ased on the blood on both sides [of the firearm], the lack of burning, soot, burning of the sheet or pillowcase." Additionally, had defendant wiped soot from Mrs. Kustok's body with a towel, Englert would have expected to find that soot on a towel, but did not.

¶ 26    Englert opined that the position in which defendant claimed to find Mrs. Kustok was not possible. The reconstruction demonstrated that the stains on defendant's shirt could not have resulted from him lying next to Mrs. Kustok when the firearm accidentally discharged or from defendant being in the bathroom when the shooting occurred. Based on the high velocity impact spatter on the shirt, shorts, and glasses, someone other than Mrs. Kustok fired the shot while standing above her, wearing those items, and holding the firearm four inches to four feet from her face.

¶ 27    On cross-examination, Englert testified that after he had formed his opinion, the State contacted him with concerns that one of the pillowcases had a substance on it that appeared to be soot. Englert subsequently conducted a visual examination of the pillowcase on March 28, 2012,

and determined that the substance was clotted blood, not soot. Englert did not perform a sodium rhodizonate test to detect the presence of lead on the pillowcase and did not recommend that one be performed. He acknowledged that his opinion that the gunshot could not have been self-inflicted or accidental was partially "because of the absence of soot."

¶ 28    Trial counsel moved for sodium rhodizonate testing of the pillowcase that Englert had examined. The trial court denied the request because the defense could have and should have performed the testing prior to trial.

¶ 29    The State rested, and the court denied defendant's motion for mistrial and a directed verdict.

¶ 30    Sarah Kustok, Mrs. Kustok's daughter, testified she did not notice any change in her mother's demeanor prior to the shooting. Sarah occasionally stayed with Mrs. Kustok when defendant traveled for business. Mrs. Kustok did not like to be alone and had discussed burglaries in the area with Sarah in the months before September 2010. Sarah, Mrs. Kustok, and defendant all planned for Sarah to spend the evening of September 30, 2010, at the Kustok house.

¶ 31    On the morning of September 29, 2010, Sarah's brother called and said defendant needed help and was at Palos Community Hospital. Sarah went to the hospital, where her brother met her and told her that Mrs. Kustok was dead. Sarah asked to see defendant, but police officers denied the request. She later told the police that she did not know anything regarding defendant's extramarital affairs or whether her parents had a firearm in the home.

¶ 32    Paul Kish, defendant's expert in bloodstain pattern analysis, testified that he analyzed the shirt, shorts, pillows and pillowcases, firearm, and glasses, and concluded that there was insufficient data available to position defendant at the time the firearm discharged. Based on Kish's

analysis, the bloodstains on the shirt were transfer stains. Similarly, Kish concluded that the bloodstains on the firearm were "all consistent with it being in contact with bloody objects on both sides." He did not believe the nature of the bloodstains on the shorts could be determined to a reasonable degree of scientific certainty and testified that the glasses had "no bloodstain pattern analysis value." Kish further testified that an area of "black deposition" on the pillowcase Englert examined on March 28, 2012, had "no physical qualities of being blood," and should have been subjected to a sodium rhodizonate test.

¶ 33    On cross-examination, Kish acknowledged that he knew before trial of Englert's review of the disputed pillowcase on March 28, 2012. Kish had access to the pillowcase before trial, and could have requested the sodium rhodizonate test, but did not.

¶ 34    Matthew Noedel, defendant's expert in crime scene reconstruction and ballistics, testified to his general disagreement with Englert's reconstruction. Noedel testified that it is not uncommon for firearms such as the one in this case to accidentally discharge while in single-action trigger mode. Based on the stippling pattern on Mrs. Kustok's cheek, Noedel believed the firearm was three to six inches from her face when it discharged.

¶ 35    Following closing arguments, the jury found defendant guilty of first degree murder.

¶ 36    Defendant filed a motion for a new trial and a motion requesting that the sodium rhodizonate test be performed on the pillowcase at issue. The trial court permitted the test by agreed order.

¶ 37    On November 20, 2014, during a hearing on defendant's motion for a new trial, the defense called Nicole Fundell, a forensic scientist for the Illinois State Police. Fundell testified that she completed the sodium rhodizonate test on the pillowcase and found that three areas were positive

for the presence of lead. Fundell also performed testing using the firearm involved in the incident and a pillow similar to the one at issue and reproduced a similar deposit pattern on the test pillow. The most consistent pattern was from a discharge distance of three inches away. Fundell testified that some part of the pillowcase must have been exposed at the time of the shooting for the detected lead deposit to form. There was, however, no bullet hole in that pillowcase or pillow. She concluded that the firearm was not lying on a pillow and was a distance greater than contact but less than six inches from the victim at the time of discharge.

¶ 38    On cross-examination, Fundell acknowledged a "possibility" that had the firearm been discharged five other times in the bedroom, those shots could be equally likely to have left the lead spots. She also acknowledged the lead may have been deposited on the pillowcase when it was moved.

¶ 39    Noedel also testified for defendant on November 20, 2014. Based on Fundell's testing, Noedel now believed that the firearm likely discharged closer than two inches from Mrs. Kustok's face. He described the presence of lead as a "game changer" because "now we have to reconstruct with this pillow as involved in the event." He contended that Englert's testimony that the firearm could not have been "at or adjacent to an intervening surface" could be "completely wrong" in light of the new test results on the pillowcase. The presence of lead on the pillowcase raised a question as to whether the blood on the firearm was "spatter from the shooting versus other transfers." Noedel testified that Englert's reconstruction, and his opinions generated therefrom, were invalidated by Fundell's test results.

¶ 40    The court denied defendant's motion for a new trial, finding that the sodium rhodizonate test results did not meet the standard for newly discovered evidence because the test could have

been performed before trial with the exercise of due diligence, and the evidence was merely cumulative. The court further found that the evidence was not sufficiently conclusive because "overwhelming" evidence aside from Englert's testimony supported the guilty verdict.

¶ 41    Following a hearing, the court sentenced defendant to 60 years' imprisonment for first degree murder (720 ILCS 5/9-1 (West Supp. 2009)).

¶ 42    Defendant appealed his conviction, arguing that the trial court erred by allowing evidence of his extramarital contacts and "incorrectly denied his posttrial motion for a new trial based upon newly discovered evidence." *Kustok*, 2016 IL App (1st) 143812-U, ¶ 2. We affirmed, finding in relevant part that defendant's newly discovered evidence claim failed because the trial court did not abuse its discretion by finding that the evidence at issue was discoverable prior to trial through the exercise of due diligence. *Id.* ¶ 72.

¶ 43    On December 22, 2017, through counsel, defendant filed the present postconviction petition, in which he argued that trial counsel was ineffective for failing to perform the sodium rhodizonate test prior to trial. He argued that counsel's conduct had already been established as objectively unreasonable because both the trial court and this court had found counsel did not exercise due diligence. Defendant further argued that he was prejudiced by trial counsel's allegedly deficient conduct because had the jury been informed of the sodium rhodizonate test results, Englert's reconstruction would have been revealed as "entirely incorrect," and his testimony rendered incredible. On February 23, 2018, the court docketed the petition for second-stage review.

¶ 44    The State moved to dismiss defendant's petition, and defendant filed a response. The postconviction court granted the State's motion and dismissed defendant's petition. The court found that defendant forfeited the claim of ineffective assistance of trial counsel by not raising it

on direct appeal and not alleging in his postconviction petition that appellate counsel was ineffective for failing to raise the issue. The court also found that defendant could not make a substantial showing of either prong of an ineffective assistance claim.

¶ 45    On appeal from the dismissal of his postconviction petition, defendant now argues that the court erred because the petition made a substantial showing of ineffective assistance of trial counsel for failure to conduct the sodium rhodizonate test before trial.

¶ 46    The purpose of a postconviction proceeding is to permit inquiry into constitutional issues involved in defendant's original conviction and sentence that were not, and could not have been, previously adjudicated on direct appeal. *People v. English*, 2013 IL 112890, ¶ 22. Issues raised and decided on direct appeal are barred by *res judicata*, and issues that could have been raised on direct appeal, but were not, are forfeited. *Id.*

¶ 47    A petition under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2016)) is considered in three stages. *Id.* ¶ 23. The postconviction court dismissed defendant's petition at the second stage of proceedings. At the second stage, the State may move to dismiss the petition, and the court must decide if the defendant's petition makes a substantial showing of a constitutional violation. *People v. Dupree*, 2018 IL 122307, ¶¶ 28-29. The court does not make factual findings or credibility determinations at the second stage. *Id.* ¶ 29. The substantial showing of a constitutional violation "is a measure of the legal sufficiency of the petition's well-pled allegations of a constitutional violation, which if proven at an evidentiary hearing, would entitle petitioner to relief." (Emphasis omitted.) *People v. Domagala*, 2013 IL 113688, ¶ 35. We review the court's dismissal of a postconviction petition at the second stage *de novo*. *Dupree*, 2018 IL 122307, ¶ 29.

¶ 48    The postconviction court here ruled that defendant had forfeited his claim of ineffective assistance by failing to raise it on direct appeal. Defendant argues that fundamental fairness requires review of his ineffectiveness claim because such a claim is disfavored on direct appeal and is more properly brought in a collateral, postconviction proceeding. See *English*, 2013 IL 112890, ¶ 22 (a court may relax forfeiture rules where required by fundamental fairness).

¶ 49    Claims of ineffective assistance of counsel may be better suited to collateral proceedings than direct appeal where the record on appeal does not permit a full review of the issue. See *People v Bew*, 228 Ill. 2d 122, 134 (2008). Here, though, the appellate record permitted a full review of the ineffectiveness issue on direct appeal. Not only was trial counsel's conduct respecting the sodium rhodizonate test discussed thoroughly during the trial, but there was also a separate posttrial hearing at which the conduct was again discussed at length and consideration was given to the potential relevance and impact that the test results could have during a new trial. Accordingly, the appellate record did not preclude defendant from raising the ineffectiveness issue on direct appeal and therefore we find no fundamental unfairness in deeming the claim forfeited for raising it for the first time on postconviction.

¶ 50    Defendant argues that in finding his claim forfeited, the postconviction court relied on *People v. Veach*, 2017 IL 120649, which held that "defendants are required to raise ineffective assistance of counsel claims on direct review if apparent on the record." *Id.* ¶ 46. Defendant contends that because *Veach* was decided after he filed his direct appeal, he should be allowed to rely on the case law prior to *Veach* which provided that an ineffectiveness issue can only be brought on collateral review. This is a mischaracterization of the law, however, as it was well-established in Illinois before *Veach* that when the facts required to evaluate counsel's conduct

appeared in the record on appeal, the traditional rules of default applied if the defendant failed to raise an ineffective assistance claim on direct appeal. See *People v Tate*, 2012 IL 112214, ¶ 14 (citing *People v. Erickson*, 161 Ill. 2d 82, 88 (1994)). To the extent defendant posits that he could not have brought the ineffectiveness claim on direct appeal because the record does not show "how Englert would have responded to test results showing that his reconstruction was incorrect," we note that Englert underwent extensive cross-examination, including specific questions about whether the pillowcase at issue had soot or bloodstains, and the effect the answer would have on his reconstruction. Moreover, defendant's experts testified that Englert's reconstruction was inaccurate, and Kish specifically testified that the pillowcase should have been subjected to the sodium rhodizonate test. Given this record, the ineffective assistance claim should have been raised on direct appeal.

¶ 51    We note that the forfeiture rules may also be relaxed when the forfeiture results from ineffective assistance of appellate counsel (*English*, 2013 IL 112890, ¶ 22), but defendant did not raise such a claim in his petition and thus cannot raise it now. See *People v. Jones*, 213 Ill. 2d 498, 507 (2004).[1]

¶ 52    In sum, we find that defendant forfeited his claim of ineffective assistance of trial counsel for failing to raise it on direct appeal, and the postconviction court's decision to dismiss his petition may be affirmed on that basis alone. Even if defendant had not forfeited the claim, however, his petition would still not warrant advancement to the third stage of postconviction proceedings.

---

[1] Defendant also makes the bare assertion that postconviction counsel was ineffective for failing to include a claim of ineffective assistance of appellate counsel in his postconviction petition. Due to defendant's failure to clearly state this argument or cite any relevant authority, he has forfeited this contention. See *People v. Oglesby*, 2016 IL App (1st) 141477, ¶ 205. Notwithstanding, this claim fails because there is no prejudice from postconviction counsel's alleged failure, as we explain herein.

¶ 53    Criminal defendants have a constitutional right to effective assistance at trial. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. To establish an ineffective assistance of counsel claim, defendant must demonstrate that counsel's conduct was deficient, and that this deficient conduct prejudiced him such that there was a reasonable probability the result at trial would have been different but for the conduct. *Domagala*, 2013 IL 113688, ¶ 36 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). A "reasonable probability" is a probability sufficient to "undermine confidence in the outcome." *People v. Enis*, 194 Ill. 2d 361, 376 (2000). Defendant must demonstrate both prongs, and if the "claim can be disposed of on the ground that the defendant did not suffer prejudice, a court need not decide whether counsel's performance was constitutionally deficient." *People v. Evans*, 186 Ill. 2d 83, 94 (1999).

¶ 54    We find that defendant's petition does not make a substantial showing of prejudice, and thus the postconviction court did not err in granting the State's motion to dismiss. First, defendant has failed to make a substantial showing that Englert's testimony at trial was so dependent on the lack of lead on the pillowcase that there is a reasonable probability that the results of the sodium rhodizonate test would have changed the verdict.

¶ 55    Englert was clear that he based his conclusions on a number of factors, not just the absence of lead on the pillowcase. These factors included the blood spatter evidence from the shirt, shorts, eyeglasses, firearm, and carpet, in addition to the spatter on the pillows and the lack of soot and powder burns on the pillowcase. The presence or lack of lead on the pillowcase does not significantly impact Englert's testimony regarding the blood spatter on the shirt as being consistent with the shooter standing above the victim. Nor does it impact the testimony that there was high velocity impact spatter on either side of the firearm and no powder burns on the bedding, or any

of the pillows or pillowcases, which, according to Englert, ruled out a scenario where the firearm discharged accidentally while lying on a surface. Similarly, the presence or absence of lead has no impact on Englert's opinion that the eyeglasses showed signs of high velocity impact spatter. The jury heard Kish's and Noedel's criticisms of Englert's reconstruction and the above conclusions, including testimony from Kish that sodium rhodizonate testing should have been performed because the pillowcase stains at issue looked like soot, and ruled in favor of the State.

¶ 56    On this record, there has been no substantial showing of prejudice, *i.e.*, of a reasonable probability that the sodium rhodizonate test results would have materially impacted the jury's weighing of the expert testimony and changed the outcome of the trial. We agree with the postconviction court that the test result evidence would be merely cumulative to Kish's and Noedel's disagreements with Englert as expressed at trial.

¶ 57    Defendant's claim of ineffective assistance also fails because he failed to make a substantial showing that Englert's testimony was so central to the State's case that there is a reasonable probability the jury would have reached a different conclusion had Englert's reconstruction and testimony been discredited at trial by the admission of the sodium rhodizonate test results. Instead, myriad additional evidence supported defendant's guilt. Dr. McElligott testified unequivocally that the victim died of a homicide, not suicide or accident, and that the firearm was 6 to 24 inches from the victim's face when it discharged. The jury would have been justified to rely on this testimony alone to conclude that someone besides Mrs. Kustok fired the shot that killed her.

¶ 58    Other testimony from five witnesses confirmed that defendant actively pursued extramarital affairs and expressed unhappiness in his marriage, providing a motive for murdering

his wife, and the sodium rhodizonate test results would have no effect on how the jury weighed this evidence. Furthermore, the State introduced uncontroverted evidence that defendant altered the crime scene, cleaned the victim's body, never called the police or an ambulance, and waited 45 to 90 minutes before he drove her to the hospital. The jury could reasonably interpret this evidence as suggestive of guilt because it reflected defendant's intent to inhibit the authorities' investigation.

¶ 59    In light of the significant evidence of defendant's guilt, he has failed to make a substantial showing of prejudice based on counsel's alleged ineffectiveness in failing to conduct the sodium rhodizonate test before trial. Accordingly, as defendant forfeited the ineffectiveness issue by not raising it on direct appeal and also failed to make a substantial showing of prejudice, the postconviction court did not err in granting the State's motion to dismiss.

¶ 60    For the foregoing reasons, the postconviction court's grant of the State's motion to dismiss is affirmed.

¶ 61    Affirmed.